**IN THE UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

UNITED STATES OF AMERICA

v.                                                    CRIMINAL ACTION NO. 3:18-00146

JUSTIN MICHAEL WILSON

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant Justin Michael Wilson's Motion for a New Trial. ECF No. 87. For the following reasons, the Court **DENIES** the motion.

**I.**
**FACTUAL AND PROCEDURAL BACKGROUND**

On July 10, 2018, Defendant was charged in a five-count Indictment. ECF No. 1. Count One charged Defendant with Carjacking in violation of 18 U.S.C. § 2119. Count Two charged him with Using, Carrying, or Brandishing a Firearm during and in relation to a Crime of Violence in violation of 18 U.S.C. § 924(c)(1)(A) and (B)(ii). Count Three charged him with Possession of a Firearm not Registered in the National Firearms Registration and Transfer Record in violation of 26 U.S.C. §§ 5861(d) and 5871. Count Four charged him with Possessing a Stolen Firearm in violation of 18 U.S.C. §§ 922(j) and 924(a)(2). Finally, Count Five charged him with Possession of a Machinegun in violation of 18 U.S.C. §§ 922(o) and 924(a)(2).[1] On May 6, 2019, Defendant pled guilty without an agreement to Counts Three and Five. After waiving his right to a jury trial, Defendant proceeded to a one-day bench trial on the remaining counts on May 7, 2019.

---

[1]The Indictment also seeks a forfeiture of the machinegun.

Prior to the start of the bench trial, the United States Attorney's Office informed the Court, Defendant, and his counsel that one of its witnesses, Frenchesca Pennington, admitted for the first time that morning that she provided a false statement about Defendant stealing the machinegun. As a result, the United States made an oral motion to dismiss Count Four. The Court granted the motion, and the bench trial proceeded on Count One for Carjacking and Count Two for Using, Carrying, or Brandishing a Firearm during and in relation to a Crime of Violence.

At the bench trial, the United States introduced evidence that on January 11, 2018, Defendant went on a crime spree spanning four counties in West Virginia. The day began with Defendant stealing a Ford Expedition in Jackson County.[2] He then traveled to Mason County and acquired an illegal AR-15 machinegun from Ms. Pennington. From there, Defendant drove to Kanawha County, where he was observed in the stolen Expedition by Chief Deputy Greg Young of the Kanawha County Sheriff's Department. A police chase ensued, with Defendant driving off the road and parallel to railroad tracks at approximately 30 to 40 miles per hour. As the area along the tracks was covered with large gravel, Chief Deputy Young was unable to keep up, and Defendant ultimately jumped the tracks and got away.

After evading Chief Deputy Young, Defendant made it to Interstate 64 and traveled westbound to Putnam County, stopping at an Advance Auto Parts in the Liberty Square shopping plaza just off the Teays Valley exit. Justin Clark testified that he was working on his mother's truck near the side of the Advance Auto Parts' building when Defendant approached him. Mr. Clark said that Defendant asked him if he wanted to get rid of the truck, but Mr. Clark responded

---

[2]The parties stipulated that Defendant stole the Expedition.

"no" because it was his not his. Defendant then opened the driver's side door of the truck and looked inside. Mr. Clark, who was working underneath the truck, stood up, pulled the door shut, and stood in front of him. According to Mr. Clark, Defendant initially was friendly, but the conversation then took a more serious tone. Defendant told him that he was an ex-Marine, had a fully automatic weapon, and was running from the law. Defendant demanded the key from Mr. Clark, but Mr. Clark pretended he did not have it and said the key were inside the store on the counter. Defendant also asked for Mr. Clark's phone, but Mr. Clark said no. Mr. Clark then went inside the store purportedly to get the key. Defendant told him not to call the police because he did not "want to have to shoot this place up. Just get me the key." Tr. 74, ECF No. 82. Mr. Clark said he entered the store through the side, and he had the manager lock the door. Mr. Clark called 911. Mr. Clark said he was in the store for about two minutes when Defendant drove the Expedition around the front of the building.

Defendant drove to another part of the shopping plaza where he encountered Matt Francisco and John Thaxton. Messrs. Francisco and Thaxton worked for the Putnam Public Service District (PSD) and were on a lunch break. Mr. Thaxton was eating inside a PSD truck, while Mr. Francisco was smoking outside the truck. When Defendant drove up, he stopped in front of them and blocked the road.

Mr. Francisco testified that Defendant got out of the Expedition and told them "it was our lucky day." *Id*. at 80. Mr. Francisco said Defendant turned as if he was going to get in his vehicle but, instead, he turned back around and faced him with the AR in his hands. Mr. Francisco

testified that Defendant said they had "two choices. We could either help him unload the stuff out of [Defendant's] vehicle and put it in our work truck, or we could die." *Id*. at 82.

Given Defendant's command, Mr. Francisco said he began taking the things out of the Expedition and putting them in the PSD truck. While he and Mr. Thaxton were moving the items, he said Defendant was rummaging around on the passenger side of the vehicle. Mr. Francisco said he thought they were finished when they had moved the things from the back seat, but Defendant then opened the hatchback, snapped his fingers, and motioned with the gun for them to move the things out of the back. Mr. Francisco estimated that it took three or four minutes to move all the items.

Defendant then asked where the keys were, and Mr. Francisco told him they were in the ignition. However, Mr. Francisco testified he thinks Defendant misunderstood him because Defendant then "stood up and raised his voice a little bit and said, where are the keys to the vehicle? Do I need to come and get them or are you going to give them to me?" *Id*. at 85. Although Mr. Francisco testified at the bench trial he could not recall where the gun was when Defendant asked for the keys, he told the grand jury Defendant raised the gun to his [Mr. Francisco's] chest.[3] Mr. Francisco testified that he believed he was being threatened by Defendant during the encounter, and he fully complied with Defendant's demands because he did not want to die.

---

[3]Mr. Francisco testified before the Grand Jury on May 15, 2018, a year before he was called to testify at the bench trial.

Mr. Thaxton also testified at the bench trial. Mr. Thaxton similarly said that, when Defendant stopped, he told them it was their "lucky day and proceeded to pull an AR out and point it at [them] and tell [them] that [they were] going to help him unload the stuff out of the SUV into [the PSD] truck or he was going to kill [them]." *Id*. at 20. Mr. Thaxton testified that he and Mr. Francisco then started moving the items from the Expedition to the PSD truck. He said Defendant put the machinegun in the front seat of the Expedition while he helped them move some of the things. Mr. Thaxton said Defendant offered him a beer, and he told him "he had just blowed all of the state troopers out of the water in Charleston." *Id*. at 26. After the backseat was emptied, Defendant picked the machinegun back up, went to the back of the vehicle and waived it, motioning for them to come to the back and unload the remainder of the things.

Mr. Thaxton said that, after they finished moving the things, Defendant put the machinegun down in the passenger side of the PSD truck, stood beside the passenger side door, and asked for the keys. Although Mr. Francisco told him the keys were in the ignition, Mr. Thaxton also stated Defendant must have misunderstood or did not hear him because "he kind of stepped up and forcefully said, are you going to give them to me or am I going to have to take them?" *Id*. at 31. When asked what he meant when he said Defendant "stepped up," Mr. Thaxton explained Defendant "stepped toward [them] and kind of, ah, swelled up kind of like he was going to – you know, squared up with us or – you know," like he was ready to get in a fight, and he spoke in a "stern" voice. *Id*. at 31-32. At that point, Mr. Thaxton said Mr. Francisco repeated that the keys were in the ignition. Mr. Thaxton said he believed that if they did not give Defendant the keys, he "was going to take them any way he had to." *Id*. at 32.

Once Defendant realized the keys were in the truck, Mr. Thaxton testified that Defendant got in the truck. Although he was scared, Mr. Thaxton said he walked up to the side of the truck and asked for his wallet and Mr. Francisco's phone. Defendant replied "no problem. I'm not a thief" and gave him the items. *Id*. at 33. Defendant then pulled away. The police arrived right after Defendant left, and Mr. Thaxton told the officer that he just stole the truck.

At the bench trial, the United States also called West Virginia State Police Officer Justin Garren to testify. Trooper Garren stated he received a BOLO[4] about the stolen Expedition. He said he was looking for it on Interstate 64, when he received information about an attempted armed carjacking at the Liberty Square shopping plaza, which was about one mile from where he was. As Trooper Garren was driving to the scene, he received information about a second possible carjacking. When he arrived, he noticed a truck pulling away and a man waving him down and pointing toward the truck. Trooper Garren rolled down his window, and the man told him the truck was stolen. Trooper Garren then initiated his lights and siren and pulled out after the truck.

Trooper Garren said he caught up with the truck as it was getting on Interstate 64 westbound. A Putnam County deputy was following behind him in a separate car. Trooper Garren stated that Defendant passed several vehicles on the entrance ramp and went partially off the road to get around a couple vehicles. Trooper Garren said Defendant was driving recklessly "like a maniac[,]" "swerving in between cars, running up behind them[,]" making cars go onto the right and left shoulders, and driving the PSD truck on both shoulders. *Id*. at 97-98. He estimated that Defendant was traveling 80 to 90 miles per hour. At one point, Defendant grabbed the gun and

---

[4]BOLO means to be on the lookout.

pointed it out the back window at Trooper Garren and the deputy who was following him. Trooper Garren stated he could see a magazine was in the gun.

As Defendant approached the next exit off Interstate 64, there were several cruisers from the Hurricane Police Department on the exit ramp. Immediately, prior to the exit is an emergency cut-through lane in the median to the eastbound side. Trooper Garren testified that Defendant drove through that section of the median, continued to drive westbound in the eastbound lanes, causing other vehicles to swerve to avoid an accident. Defendant traveled approximately 200 to 300 yards before he went the wrong way up the eastbound entrance ramp and turned right onto Hurricane Creek road.

Trooper Garren stated that he and the deputy continued to follow Defendant. He said Defendant went through two traffic lights at a high rate of speed, passing cars, without stopping or using his breaks. Just past the second traffic light, Hurricane Creek becomes a two-lane road. Trooper Garren said the road was a little wet so he slowed down to avoid an accident. He noticed Defendant was driving on the wrong side of the road through some of the curves, but he eventually lost sight of Defendant for a few seconds. When Trooper Garren rounded a curve, however, he saw Defendant had wrecked and went partially off the left side of the road. He also noticed the front engine compartment of the truck was on fire. He loudly commanded Defendant to show his hands, but he got no response from inside the vehicle. Other officers arrived on the scene within a minute or less. Once they were able to see in the vehicle, they noticed Defendant was either unconscious or simply not responsive. Trooper Garren and a couple other officers

approached the vehicle, opened the door, removed the gun from the passenger side, and then pulled Defendant out of the driver's side.

Once they got Defendant out and attempted to handcuff him, he woke up. Trooper Garren testified Defendant resisted being handcuffed, and it took him and a couple other officers to restrain him and get him handcuffed. Defendant then was transported to the hospital. Trooper Garren further said that the clip to the machinegun was not loaded and there was no ammunition found in the truck.

On cross examination, Trooper Garren was questioned about the narrative portion of his police report, which read: "This officer and other Putnam County units removed the suspect from the vehicle and placed him in custody without further incident[.]" *Id*. at 111. Trooper Garren acknowledged there was nothing in his report about Defendant resisting being handcuffed.

The United States also called Justin Holtz, a special agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), to testify. Agent Holtz stated that he received two recordings of telephone calls Defendant made from jail. The first call was made to his mother on January 17, 2018. The second recording was made on February 25, 2018, to an identified woman.

In the first recording, Defendant related to his mother that his plan was to go to South Carolina. However, the Expedition he stole did not have enough gas, and he spent his last

twenty dollars on beer and cigarettes. In the second recording, he told the unidentified woman that he just felt like he had nothing to lose.

At the conclusion of the trial, the Court found Defendant guilty of the remaining two Counts. In making its decision, the Court recognized that the only real issue in controversy was Defendant's state of mind at the time he stole the PSD truck. Specifically, the critical question was whether Defendant had the intent to do serious bodily injury or kill if necessary when he took the truck. In summarizing the facts, the Court found that, after he stole the Expedition and obtained the machinegun, he realized he did not have enough gas to make it to South Carolina as he planned. Instead of trying to get money for gas, Defendant decided to steal another vehicle. When Mr. Clark was unwilling to trade his mom's tuck, Defendant threatened and intimidated him by stating such things as he was former Marine and he had a weapon. Fortunately, Mr. Clark thought quickly and said he did not have the key. The fact Mr. Clark was able to go back in the store and get away from Defendant reflected on the ill-conceived and irrational nature of Defendant's plan, but it did not signify Defendant was unwilling to use force to steal the vehicle. Mr. Clark simply outsmarted him.

Realizing the police were after him, Defendant then quickly drove to where Messrs. Thaxton and Francisco were located, and he at least partially blocked the PSD truck. At that point, Defendant immediately started threatening them by telling them it was their lucky day, he had a weapon, and he would kill them if they did not help him move his things from the Expedition to the PSD truck. Defendant brandished the weapon throughout much of this confrontation, and he used it to make the victims do what he asked. Although Defendant did not actually do bodily harm

to either man, the Court agreed with the United States that it was because it was unnecessary as the victims immediately complied with all Defendant's demands. Therefore, the Court found these facts did not denote a lack of intent to do serious bodily harm on Defendant's part. Rather, they merely indicated the situation did not escalate due to the victims' compliance. However, as soon as Defendant believed the men were not going to give him the keys, Defendant changed his posture, became physically assertive and aggressive, and threatened them. Defendant knew the police would be there soon, and he had no time to waste. At that point, it was clear Defendant was going to take the keys one way or another, and the Court found the evidence demonstrated that Defendant had the intent to inflict serious bodily injury on the victims, if necessary, to get the keys. Although Defendant may have known the machinegun was unloaded, the evidence showed Defendant was a desperate and irrational man, who through his actions and body language, was willing to physically fight the victims to get the keys and make his escape. Fortunately, Defendant figured out the keys were in the truck so he left without inflicting serious bodily injury on the victims, but the Court finds the evidence shows Defendant would have taken such action if it was needed.

Although unnecessary to the Court's conclusions as to Defendant's intent, Defendant's actions after the carjacking are consistent with the Court's conclusions as to Defendant's state of mind at the time he took the PSD truck. After stealing the truck, Defendant continued to take extraordinary steps to avoid capture. He was weaving in and out of traffic on Interstate 64 at a high rate of speed, forcing other drivers off the road, and pointing the machinegun back at the officers. Prior to the next exit, he crossed over the Interstate and traveled the wrong way on both the Interstate and the entrance ramp. He drove through two traffic lights and ended

up crashing the truck on a curvy two-lane road. It was obvious during this entire time Defendant had no regard for the other drivers, any pedestrians, the police, or anyone else he might encounter. Defendant's motivation was to get away, and the Court has no doubt that he intended to inflict serious bodily injury or kill if it was necessary to get the keys when he took the PSD truck. Therefore, the Court found Defendant guilty of Count One for Carjacking and Count Two for Using, Carrying, or Brandishing a Firearm during and in relation to a Crime of Violence. Defendant now moves for a new trial.

## II.
## DISCUSSION

In support of his motion, Defendant relies upon *Holloway v. United States*, 526 U.S. 1 (1999). In *Holloway*, the Supreme Court held that the *mens rea* of the carjacking statute centers on "the defendant's state of mind at the precise moment he demanded or took control over the car 'by force and violence or by intimidation.' If the defendant has the proscribed state of mind at that moment, the statute's scienter element is satisfied." 526 U.S. at 8. The Supreme Court continued by stating that "an empty threat, or intimidating bluff" would be insufficient to meet § 2119's specific intent requirement. *Id*. at 11. When a defendant has not inflicted, or attempted to inflict, serious bodily harm, the United States is required "to prove beyond a reasonable doubt that the defendant would have at least attempted to seriously harm or kill the driver if that action had been necessary to complete the taking of the car." *Id*. at 12. Such intent must be taken at the moment the vehicle is taken. *United States v. Bailey*, 819 F.3d 92, 97-98 (4th Cir. 2016).

In his motion, Defendant argues that the United States would not have been able to prove he possessed the requisite intent, but for the admission of evidence it did not disclose to him prior to trial. Specifically, Defendant argues that Messrs. Francisco, Thaxton, and Garren all

testified inconsistent with their prior statements. As those inconsistent statements were evidence of intent to cause death or serious bodily injury—an essential element of carjacking[5]—Defendant asserts the United States' use of this undisclosed testimony impaired his defense and prevented him from receiving a fair trial.

With respect to Messrs. Francisco and Thaxton, both men gave brief one-paragraph written statements to the Putnam County Sheriff's Office on the day of the event. In their statements, they both said Defendant made a comment about it being their "lucky day," he threatened to kill them, and he brandished the machinegun. *Putnam Cty. Sheriff's Dep't Voluntary Statement by Matt Francisco*, ECF No. 87-1; *Putnam Cty. Sheriff's Dep't Voluntary Statement by John Thaxton*, ECF No. 87-2. Both men also mentioned that Defendant asked twice for the keys to the PSD truck. The first time he either did not hear the answer or did not understand what was said. The second time he asked if he would be given the keys or if he would have to take them. *Id*. Mr. Francisco testified similarly before the grand jury, but he added more detail. For instance, he said Defendant "was very serious" when he made his threat. *Grand Jury Tr. of Matt Francisco*, at 6, ECF No. 88-1. He also said that Defendant was not calm when he gave his orders, his voice "was raised a little bit," and "he was very hyper." *Id*. at 10. Likewise, Mr. Thaxton told the grand jury that Defendant appeared to be serious when he threatened to kill them. *Grand Jury Tr. of John Thaxton*, at 9, ECF No. 88-2. However, he said that, when Defendant demanded they move his things from one vehicle to the other, he appeared "[f]airly calm for the situation. You could tell he

---

[5]*See United States v. Foster*, 507 F.3d 233, 246-47 (4th Cir. 2007) (stating that one element of carjacking is that the defendant possessed the "intent to cause death or serious bodily harm" even if such intent was conditioned on the necessity to take such action).

was in a hurry and he was a little bit nervous but for the situation he just---what I would have thought would have been he was pretty calm from what I thought he would be." *Id*. at 7.

Defendant complains that there is nothing in these statements or the grand jury testimony about him raising his voice or looking like he was ready to fight as they testified about during the trial. Defendant argues the United States knew about this additional evidence prior to trial, but it was not disclosed. Defendant asserts this evidence was crucial to the United States' ability to prove intent under the carjacking statute, and its failure to disclose this evidence prior to trial violated his due process rights.

To prevail on a claim of prosecutorial misconduct, the defendant must show the conduct "prejudicially affected [his] substantial rights so as to deprive [him] of a fair trial." *U.S. v. Golding*, 168 F.3d 700, 702 (4th Cir. 1999) (internal quotation marks and citations omitted). Pursuant to Rule 33 of the Federal Rules of Criminal Procedure, a court may grant a new trial in the "interest of justice." *Fed. R. Crim. P.* 33, in part. The decision of whether to grant a new trial rests in the sound discretion of the trial court. *United States v. Singh*, 54 F.3d 1182, 1190 (4th Cir. 1995). The court must exercise its discretion "sparingly" and overturn a verdict only in those rare instances "when the evidence weighs heavily against it." *U.S. v. Smith*, 451 F.3d 209, 217 (4th Cir. 2006) (citation and internal quotation marks omitted).

Initially, the Court recognizes that the United States disclosed the names of the witnesses in advance of trial, giving Defendant the opportunity to contact and interview them. The United States also disclosed their statements and their grand jury testimony in advance of trial. For

the following reasons, the Court further disagrees with Defendant's assessment of the evidence against him.

Here, it is undisputable that Mr. Francisco told the grand jury that, when Defendant was giving his orders, his voice "was raised a little bit[.]" *Grand Jury Tr. of Mr. Francisco*, at 10. This grand jury testimony was disclosed to Defendant prior to trial and is completely consistent with and, in fact, nearly identical to his trial testimony when he said Defendant "raised his voice a little bit and said, where are the keys to the vehicle? Do I need to come and get them or are you going to give them to me?" *Id*. at 85. Although Mr. Thaxton told the grand jury Defendant appeared "fairly calm" under the circumstances, such evidence is not inconsistent with his trial testimony that Defendant spoke in a "stern voice." Stern and calm are not irreconcilable terms. In fact, it is commonplace for someone to speak sternly and seriously, yet calmly.

Moreover, the fact the United States elicited additional details about Defendant's demeanor and physical posture while he was verbally threatening them does not contradict Messrs. Francisco and Thaxton's prior statements. Both men gave prior statements that Defendant threatened to kill them and brandished the machinegun, which they took seriously. When Defendant asked for the keys a second time, both men said Defendant gave them an ultimatum. Either they would give him the keys or he was going to take the keys from them. It is completely consistent with these prior statements and easily assumed based upon these prior statements that Defendant would have exhibited more aggressive body language if he was getting ready to physically take the keys from the victims. Obviously, Defendant was preparing and willing to fight

the victims for the keys, and this Court has no doubt he had the intent to (and would have) at least attempted to seriously harm or kill the victims, if necessary, to reach his goal.

In his motion, Defendant relies heavily upon the fact he knew the gun was not loaded so he merely was making empty threats. In support, he cites *United States v. Fekete*, 535 F.3d 471 (6th Cir. 2008), for the proposition that "the use of a loaded gun (or even an unloaded one) is not a required element of the carjacking statute," but that "[a]bsent some additional evidence of bad intent . . . evidence that a defendant brandished a firearm during a carjacking is insufficient on its own to establish a specific intent to kill or cause serious bodily harm." 535 F.3d at 480 (citation omitted). In these types of cases, the United States must "present additional direct or circumstantial evidence that supports a finding that the defendant would have killed or seriously harmed the victim if the victim had resisted . . . the government must establish 'brandishing plus' in order to satisfy § 2119's specific intent element." *Id*. Merely brandishing the firearm is not enough, "the factfinder is to look at the totality of the circumstances to evaluate whether the defendant's words and actions sufficiently demonstrated a conditional intent to cause death or serious bodily harm." *Id*. at 481 (citation omitted). If there is weak evidence that a gun is loaded, it "weakens [the Government's] argument that the defendant possessed the conditional intent" necessary and, if a "defendant is able to present evidence that he or she knowingly chose to carry an inoperable firearm or purposely unloaded the firearm . . ., such evidence would strongly suggest that the presence of the gun was an 'empty threat' or an 'intimidating bluff[.]'" *Id*. at 481 (citation omitted).

The Court finds, however, the United States satisfied the "brandishing plus" standard in this case. As the Court found at trial, Defendant was desperate to leave the shopping plaza before the police arrived. He had evaded the police in Charleston, but he failed his attempt to steal the truck from Mr. Clark. He knew the police would be there soon, and he obviously did not have much time to waste to avoid capture. After being tricked by Mr. Clark, Defendant immediately became far more aggressive when he approached Messrs. Francisco and Thaxton by brandishing the machinegun and threatening to kill them. As Defendant also knew there were no bullets in the machinegun, it makes complete sense that he was preparing himself to use physical force if necessary to get the keys. Such testimony in no way ambushed Defendant at trial as it is completely consistent with what Messrs. Francisco and Thaxton previously said.

In fact, even if the Court would not consider the testimony of Defendant's physical appearance, the totality of the other evidence leading up to and at the time he stole the PSD truck demonstrates Defendant possessed the requisite intent to cause death or serious bodily injury to get the keys from the victims at the moment he took the truck. As explained above, Defendant's aggression was escalating, and he was becoming more and more desperate and irrational. Against the backdrop of immediately brandishing the machinegun and telling the victims he would kill them if they did not comply with his demands, Defendant expressly said he would take the keys from them if needed. Given Defendant's pattern of behavior up to this point in time, it is inconceivable to the Court that Defendant did not have the specific intent at that moment to cause death or serious bodily injury in order to get the keys from the victims if they did not comply. The Court has no difficulty finding Defendant would have taken whatever action was necessary to get the keys. The only reason Defendant did not attempt to seriously injure or kill the victims is

because the keys were already in the truck so he was able to leave without resorting to physical violence.

Defendant also argues that Trooper Garren's report was inconsistent with his testimony. Specifically, Defendant complains that in his report, Trooper Garren stated that Defendant was removed "from the vehicle and placed . . . in custody without further incident,"[6] but he testified that Defendant struggled with officers while being handcuffed. To the extent this testimony is inconsistent with the report, the Court finds it is inconsequential. As stated by the Court at trial, any testimony about what happened after the carjacking is of very limited value. The Court did not rely upon this testimony in finding Defendant possessed the requisite intent at the time of the carjacking. Therefore, the Court finds no reason to grant a new trial under *Brady v. Maryland*, 373 U.S. 83 (1963), or *Giglio v. United States*, 405 U.S. 150 (1972). *See Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 555 (4th Cir. 1999) (holding that to prevail on a *Brady* claim, a defendant must show that: "(1) the evidence at issue must be favorable to the defendant, whether directly exculpatory or of impeachment value; (2) it must have been suppressed by the state, whether willfully or inadvertently; and (3) it must be material" (citation omitted)). Defendant's post-carjacking actions simply show he continued to act irrationally and took extraordinary steps and created incredible risks to everyone to avoid being captured, which was consistent with his state of mind during the entire course of events. Although unnecessary to the Court's finding as to Defendant's intent, it provided further evidence that Defendant was willing to take whatever steps were necessary, including physical violence, to get his way.

---

[6]*Tr.* at 111.

Therefore, based upon a review of the evidence and the briefing of the parties, the Court finds Defendant has failed to show that the United States' actions "prejudicially affected [his] substantial rights so as to deprive him of a fair trial." *Golding*, 168 F.3d at 702 (internal quotation marks and citations omitted). Thus, the Court, in the exercise of its discretion, finds no grounds to grant a new trial pursuant to Rule 33.

### III.
### CONCLUSION

Accordingly, for the foregoing reasons, the Court **DENIES** Defendant's Motion for New Trial. ECF No. 87.

The Court **DIRECTS** the Clerk to send a copy of this Order to the defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER:        September 19, 2019

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE